IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No.  08-cv-02112-RPM

RICHARD "Chance" LEOFF,

      Plaintiff,

v.

S AND J LAND COMPANY,
a Colorado Limited Liability Company,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

In 2004, Richard Leoff and Stephen Finger lived in the Town of Telluride, high in the

San Juan Mountains in Southwestern Colorado.  They were friends, seeing each other daily in

the small community of little more than 2,000 residents.  Leoff was in the travel business and his

life partner, Marta Unnars, had an antique store.  Telluride, the county seat of San Miguel

County, was the center of mining activity in the 19th Century and is a designated historic site.

Most of the Town is an historic district protected by an Historic Architectural Review

Commission (HARC) with 5 members and two alternates.  Any new construction in Telluride

must first be reviewed by the Town staff and then submitted to HARC for a determination of its

acceptability.  If approved, a Certificate of Acceptability is issued and the project may then go

forward with an application for a building permit and compliance with a building code and other

regulatory requirements of the municipality and county.

The Town is near a ski and vacation resort.  Another municipality, Mountain Village, has very expensive houses and condominiums housing recreational users of these facilities.  The area provided very lucrative business opportunities for real estate development.  Finger, originally from South Africa, came to Telluride in 1993.  He had successfully built residential projects in Mountain Village and Telluride.

Jeffrey Lehrer, a resident of Scottsdale, Arizona, formerly in the title insurance business, became an investor in Finger's projects and an active participant in obtaining financing for them. He met Leoff through Finger early in 2004.  Lehrer and Leoff together attempted unsuccessfully to acquire a lot for the construction of a 2 unit condominium.

Finger and Leoff were aware of a parcel of land in the Town located at 149 South Tomboy Road, that was subject to restrictions as a leftover from a condominium development. Leoff thought that these restrictions could be modified to permit construction of a 14 unit condominium complex.  He discussed the possibility with Finger and Lehrer.  The three agreed to acquire the property and construct a 14 unit condominium project using modular construction. This came to be called the White House Project.

Leoff knew that Matt Mitchell, doing business as High Mark Development, Inc. had done modular construction in Telluride.  In response to Leoff's inquiry, Mitchell submitted a cost estimate of $150 per sq. ft. for a "turnkey" project for 14 +/- 550 sq. ft. single bedroom units on February 27, 2004.  (Ex. 1.)

Leoff, Finger and Lehrer agreed to go forward and share equally in the anticipated profit from the development, with Finger and Lehrer providing the financing and Leoff contributing his

services in obtaining approval from HARC, meeting all of the regulatory requirements and managing the construction.

On April 26, 2004, Leoff wrote a synopsis, outlining two plans for a 14 unit project, estimating costs and an expected profit margin based on Mitchell's $150 sq. ft. estimate.  He summarized the issues that may arise in obtaining approvals for site coverage and density. (Ex. 27.)

Through the services of Steve Catsman, a broker with the firm of Telluride Real Estate Corporation (TREC), Finger purchased the land in the summer of 2004, paying $565,000, borrowed from Vectra Bank.

The first public hearing, beginning the approval process before the Town Planning and Zoning Commission, was held on June 10, 2004.  Because of the high cost of housing in Telluride, the Town requires that a part of a new development be designated as affordable housing available for rent or purchase by employees or other local residents meeting certain criteria.  Those deed restricted units may also be price controlled by the Telluride Housing Authority.

During the negotiations for approval, the size of the project changed to 9 units with one of them designated for affordable housing.

Finger and Lehrer formed S & J Land Company, LLC (S&J), a Colorado limited liability company, in 2005 for this project.  The informal arrangement with Leoff was changed from equal thirds to permit participation by Finger's brother making the percentages 30% for each of the three venturers and 10% for the brother.

Leoff was concerned about the informality of the venture and asked Lehrer to prepare documents to memorialize the arrangement.  On March 14, 2006, Leoff, for himself, and Finger as manager of S&J, signed a document, entitled Management Agreement.  (Ex. 12.)  At the same time, Finger and Lehrer signed a document entitled Development Agreement and Operating Agreement of S & J Land Company.  (Ex. 11.)  The Operating Agreement recites an effective date of February 10, 2005.

These two documents have confusing and inconsistent provisions which defy any attempt to define the relationship of the three "partners" and their respective obligations and interests in this development project.

The initial recital in the Management Agreement reads as follows:

S&J was formed on February 10, 2005, for the express purpose of purchasing land, constructing a residential multi-unit building, and selling individual units to homebuyers. It was agreed that Stephen Finger and Jeffrey Lehrer would provide capital for S&J and would be the only two members. It was further agreed that Chance Leoff would manage the project from time of land acquisition to the sale and completion of all units." Leoff's duties as Manager would include the following:

(1)     To manage and oversee the acquisition of the property, the design of development property improvements, including hiring and management of all architects, engineers, and other consultants, to secure a general contractor, and to manage the entitlement and approval process through all required municipalities.

(2)     To execute and deliver required permits, licenses, agreements, contracts, leases, documents and other instruments appropriate in furthering the acquisition, development, design, construction, management and completion of the development property improvements in accordance with the plans, specifications and budgets approved by the members.

(3)     To manage and oversee the construction and development of development  property improvements on the development property.

(Ex. 12.)

The document then shifts from the past tense to the present in these two paragraphs:

> It is agreed that Duty 1, as specified above, has been completed and that Leoff is entitled to 30% of all profits or losses of S&J, as defined in III-R of the Operating Agreement of S&J, and to be distributed per Section 6 of the same agreement.

> It is further agreed that Leoff shall be entitled to $100,000 prior to completion of construction, of which half shall be paid as a Supervisor/Owner Representative Fee and half will be paid as an advance towards Leoff's share of profits or losses. As Leoff had been paid $10,000 on February 17, 2005, therefore Leoff is to be paid $90,000 for the remainder of the project. All payments are to be funded through the construction loan draw and will be paid on a monthly basis at a rate of $9,000 for 10 months upon funding of said bank construction loan. If all units are completed and sold, the bank loan is paid back in full prior to the end of 10 months, and Leoff is still employed at that time by S&J as a Supervisor/Owner Representative, than [sic] Leoff's pro-rata share must be accounted for, even to the extent that if Leoff owes S&J monies upon completion, then all deficits of Leoff are due and payable immediately upon settlement of the bank construction loan.

(*Id.*)

This language is followed by the authority of S&J to terminate Leoff upon failure to perform adequately the duties in paragraphs (2) and (3):

> It is further agreed that if Leoff does not perform the duties in an adequate manner as outlined above as Duties 2 and 3, then all monthly payments will cease immediately. It will be at the discretion of S&J to determine that Leoff has performed adequately and can terminate his duties upon failure to do so in S&J's estimation immediately and without notice, but only with reasonable cause. All supervision fees owed on a pro-rata basis up to date of termination shall be paid to Leoff immediately. No further profit advances shall be paid in the event of termination and all advances paid up to that time will be charged to Leoff's computed 30% profit as outlined above.

(*Id.*)

The document appears to vest Leoff with 30% of profits or losses of S&J, as they are determined in the Operating Agreement. The definitional reference is to S&J's taxable income

or loss for each fiscal year and the distribution provision is for available cash flow for each fiscal year to the members after paying creditors.  Leoff was not a member of S&J and the yearly taxable profit or loss does not correlate with a gain or loss on the White House project.

The Management Agreement appears to make Leoff responsible for completion of construction as an employee of S&J subject to termination of that role at the discretion of S&J. The Operating Agreement has contrary language giving control and management to the members of S&J – Lehrer and Finger.

On March 31, 2006, HARC issued the Certificate of Appropriateness, approving the project, with conditions, including compliance with the Town's ordinances and the Uniform Building Code.  That action was the basis for the recognition in the Management Agreement that Leoff had completed the duties described in paragraph (1).

Although Leoff had identified Mitchell's High Mark Development as the contractor, it was Lehrer and Finger who signed the contract between S&J and High Mark.  The contract, entitled Cost Plus A Fixed Fee Construction Contract, effective on the date of signing, July 24, 2006, provides for a fixed fee of 15% of the cost of the work.  (Ex. A-3.)

That was ill-advised.  The billed costs went far above expectations and construction took much longer than was estimated.  The Construction Contract referred to plans and an estimate as Exhibit A but no exhibit is attached to the copy received in evidence.

The modules were manufactured by a firm in Nebraska, pursuant to Mitchell's order placed shortly after the signing of the Construction Contract.  There were difficulties in getting approval of the Town building department and two different architects were used in that process.

The building permit was issued in early March, 2007 and preparation of the site began then. The modules arrived in May, 2007 and were put together in two days. Plumbing and electrical work had to be done. A problem arose with the structural steel because the fabricator had not coated it with fire-proof material as required by the Building Code. There was work done on a neighboring building in exchange for releasing a claim of easement by prescription since the White House property had been used for access to those condominiums.

In December, 2006, Leoff expressed his interest in living in the deed-restricted unit. Finger and Lehrer orally agreed that he could acquire it as part of his share of the expected profits. There were added costs in changing that unit to meet his requirements.

Leoff frequently visited the work during construction. Lehrer managed the financial aspects from his office in Scottsdale. Alpine Bank provided funds by a line of credit secured by a deed of trust on the property. The borrower was S&J. Finger and Lehrer were guarantors. Periodic payments to High Mark were made by draws authorized by Lehrer. There were change orders which took the project well over budget. The additional costs and delays were of concern to the bank and Lehrer gave assurances to the bank's loan officer.

For example, by letter dated September 21, 2007, Lehrer wrote: "We are in constant contact with Matt [Mitchell] about these and unfortunately there is little we can do to relieve the problem . . . . Unfortunately, Matt has warned me that more overruns are imminent now." (Ex. 16.) In a fax from Lehrer to the Bank dated December 27, 2007, Lehrer said that he was "distraught and disappointed . . . as we continue to be charged for costs so in excess of budget that the situation is virtually laughable." (Ex. 17.) Lehrer testified that by early 2008, construction costs had risen to $400 per square foot.

In April 2008, construction of the White House was completed and the Town issued a Certificate of Occupancy. After the construction was completed, S&J addressed its complaints about the construction costs with High Mark and Mitchell agreed to a reduction of High Mark's fee in the amount of approximately $200,000. (Tr. 504:7 – 505:3.)

While the White House was being constructed, Finger was involved in another real estate development project in Telluride known as Element 52. The developer of Element 52 is XYZ Land Company, LLC ("XYZ"), a limited liability company whose members include Finger, Catsman and others. (Tr. 334:11 – 335:8.) Finger is one of the four managers of XYZ. Planning of the Element 52 project began in 2005, and construction commenced in 2007. Element 52 is a 34 unit, 7-building "high end" condominium project, having units priced in the range of approximately $1200 per square foot. The expected built-out value is $100,000,000. (Tr. 256:12-16; 333:21-25.) Finger has a 10% equity interest in XYZ, and the opportunity to earn an additional fee of approximately 6.6%. (Tr. 426:16-21.) Neither Lehrer nor Leoff had any interest in or involvement with XYZ or the Element 52 project.

The Town of Telluride required that 5,357 square feet of the Element 52 development be dedicated to employee housing. Finger considered the possibility that XYZ might satisfy Element 52's employee housing requirements off-site by using White House units, rather than providing employee housing on-site at Element 52. Leoff testified that Finger told him in 2007 or early 2008 that this concept was something that XYZ was thinking about doing and if it could be done, the deal would be structured to compensate Leoff the same or better than the original plan. (Tr. 130:8-13.) Leoff testified that in early 2008, Finger told him that "the deal was gone and wasn't coming back." Leoff testified that Finger assured him that the XYZ proposal was no

longer on the table and they were trying to put the White House units "back into contract."

(Tr. 133:14 – 134:4.)

That reference was to the fact that Catsman had obtained pre-construction contracts for the purchase of the eight free market units at favorable prices but all of the contracts had been cancelled because of the delays in the construction.

Leoff did not believe Finger's assurances about the XYZ deal and feared that he was being shut out of the White House project.  He consulted an attorney who advised him to record the Management Agreement with the county.  He did that on April 17, 2008.

In seeking an extension of the bank loan, counsel for S&J wrote the following letter dated May 16, 2008:

> Recently, the owner/developer of the Element 52 project, also located in the Town of Telluride,  approached [S&J] about acquiring the right to place deed restrictions on the [White House] eight free market units to satisfy Town required employee housing mitigation requirements for the Element 52 project.  The owners of Element 52 have proposed paying my clients the sum of $2,200,000 as consideration for this right to place employee housing deed restrictions on the eight free market units and take credits associated with such employee housing mitigation and apply it against the employee housing mitigation requirements generated by the Element 52 project. . . . We have submitted draft applications for these proposals with the Town to gauge Town interest and find that the Town agrees that this proposal would appear to advance numerous Town policy goals and objectives relative to the provision of employee housing.
>
> An agreement between S&J Land Company and Element 52 providing for this sale has been drafted and is anticipated to be executed by the parties in short order.  I need to disclose that some members of S&J Land Company and the Element 52 have an ownership interest in Element 52.  The negotiations between S&J Land Company and the Element 52 project have been at arms length and the consideration proposed to be paid reflects fair market value for employee mitigation credits. Should the Town grant these approvals, the parties would close on the agreement and the consideration would thereupon be paid to S&J Land Company.

>Once the deal is implemented, S&J Land Company would continue to own the individual units in the White House Condominium and could either sell or rent them subject to the Town's affordable housing requirements. . . .
>
>S&J Land Company anticipates to net approximately $2.1 to $2.3 million from the sale of the deed restricted units for a total revenue of $4.3 to $4.5.

(Ex. 19.)

Leoff had no knowledge of this letter.  The bank extended the loan and S&J began renting White House units to employees of the contractor on the Element 52 project.  Alarmed that he would not have any say in the future of the property, Leoff, on the advice of his attorney, filed a Statement of Lien, claiming a mechanic's lien of $800,000, being his estimate of 30% of what he believed the value of the project would be if the free market units were sold at market prices.

His attorney filed this action on September 30, 2008, naming S&J and Alpine Bank as defendants.  He alleged that S&J owed Leoff "a net sum of not less than $800,000 for the value of his services in project management incorporated into the improvement of the property," and claiming that he had a valid mechanics' lien upon the property.  (Compl. ¶¶ 13-15.)  He pleaded claims for an award of mechanics' lien rights, breach of implied contract, foreclosure of mechanics' lien, declaratory judgment, and unjust enrichment.  On November 21, 2008, Leoff recorded an amended mechanics' lien statement in the real property records of San Miguel County, modifying the amount of the claimed lien to $600,000.  (Ex. B-9.)

Defendants Alpine Bank and S&J answered, denying the Plaintiff's claims, and S&J asserted counterclaims alleging (1) that the Management Agreement created a partnership relationship, (2) that Leoff's mechanics' lien was spurious, and (3) that Leoff had breached the Management Agreement by mismanaging the project.  S&J sought damages attributable to the

-10-

alleged wrongdoing by Leoff and requested an order authorizing S&J to wind up and terminate the partnership by selling the White House, paying third party creditors (including the Bank) and distributing any remaining funds according to the Management Agreement.

On June 1, 2009, the court granted partial summary judgment dismissing Leoff's mechanics' lien claim and granting Leoff leave to file a first amended complaint.  (Dkt. 48.) After dismissal of the mechanics' lien claim, Leoff recorded a notice of lis pendens in the San Miguel County real property records.  (Ex. B-17.)  Leoff's first amended complaint asserted claims of breach of the Management Agreement, unjust enrichment, fraud, and breach of fiduciary duty, for which he sought damages, injunctive relief, and a declaration that Leoff had valid lien rights superior to those of the Bank.

While the litigation was pending, S&J listed the units for sale as free market units, employing the services of Teddy Errico ("Errico"), a TREC real estate agent.  Errico's marketing efforts did not generate sales.  S&J also continued to pursue the XYZ concept.  In a letter to Leoff's counsel dated July 30, 2009, counsel for S&J described the XYZ's proposal, as of that date.  (Ex. B-10; *see also* Ex. B-11.)  Leoff objected to the proposed XYZ transaction and refused to release the lis pendens.

S&J petitioned the court for an order declaring the lis pendens invalid under Colorado law.  Leoff opposed that motion.  The court denied S&J's motion, finding that the relief requested required adjudication of the Plaintiffs' claims and stated "an invalid lis pendens is subject to a statutory remedy in Colorado which will be available to S and J Land Company if it ultimately prevails in this litigation." (Order, Aug. 11, 2009, Dkt. 65.)

In October, 2009, the Town approved an application by XYZ, allowing that entity to use White House units to meet XYZ's affordable housing requirement, subject to a requirement that the White House property be free of the encumbrance caused by Leoff's lis pendens.  S&J moved for court approval of the proposed XYZ transaction, requesting that the lis pendens be released to allow the transaction to proceed and offering to deposit any proceeds of the sale (after payment of the Bank loan) into the court registry pending resolution of the parties' claims in this action. Leoff opposed S&J's motion, arguing that the transaction was detrimental to Leoff's interest.  The court denied S&J's motion.

As a result of the lis pendens, XYZ was unable to use the White House units to satisfy the Element 52 employee housing requirement.  It proceeded to meet Element 52's employee housing requirement on-site at Element 52.

A trial scheduled for July 12, 2010, was vacated and rescheduled when Leoff's original counsel withdrew due to a conflict.  On November 18, 2010 – four days before trial was set to begin on November 22, Leoff stipulated to dismissal with prejudice of his claims against Alpine Bank.  (Dkt. 127, 128.)

After trial, the court issued a Decree of Dissolution and Order of Sale, dissolving the White House partnership.  (Dkt. 147.)  S&J was authorized to act as the winding up partner and to sell the White House condominium building, the partnership's sole asset.  The lis pendens was released by that order.

On February 25, 2011, S&J filed a report of sale, describing the auction procedure and S&J's successful bid of $3,150,000.00.  The Bank subsequently agreed to discount its loan payoff to $3,050,505.00.

In accepting the defendant's contention that the Management Agreement created a partnership under Colorado law, because of its provision for sharing profits and losses, this court's primary concern was to free up the confused legal status of the property.  Legal title has always been held by S&J since the summer of 2004 but this litigation prevented marketability until entry of the Decree of Dissolution and Order of Sale.

After the trial, plaintiff's counsel was permitted to file a Second Amended Complaint to enable Leoff to state claims to conform to the evidence.  He now asserts that S&J breached its fiduciary duties as his partner by attempting to appropriate the property for the benefit of Element 52.  He further contends that S&J failed to market the units before the collapse of the real estate market in Telluride and elsewhere in the summer of 2008.

The plaintiff also points out the ambiguities in the Management Agreement that confuse its characterization as a partnership agreement.  Leoff was given no interest in the real estate and his participation in profits and losses is of the partner, S&J, not of the partnership.  There is also the inconsistency between the duties to be performed by Leoff as an employed manager and the provisions of the Operating Agreement of which he is not a party.

In fact, the overall management of the development was taken over by S&J and particularly Lehrer who authorized payment to Mitchell's company for all of the changes and in spite of the delays.

The failure of the parties to retain adequate legal services in structuring their informal agreements to develop a successful condominium project defies any attempt to adjudicate their claims and counterclaims in accordance with any established common law precedents or the Colorado statutory law of partnership.

-13-

It may be that the complete collapse of the cooperation that would be expected of participants in a common venture, who were friends, was affected by the misfortune of Leoff falling seriously ill in April, 2008, requiring him to obtain treatment in Boston, Massachusetts. He was gone from Telluride for 2 ½ months and unable to participate in any business dealings at the critical time just before the market failure. The timing of his record filings and the initiation of this lawsuit was unfortunate and was, perhaps the result of his former lawyer's lack of full information. Leoff was back in Boston for additional treatment in August, 2008.

Accepting that the one paragraph of the Management Agreement created a partnership for a particular undertaking under the Colorado Uniform Partnership Act, S&J dissociated itself by engaging in conduct relating to partnership business which made it "not reasonably practicable to carry on the business of the partnership" with Leoff. C.R.S. § 7-64-601(1)(e)(III). The effect of that dissociation by one of the two partners resulted in a dissolution of the partnership under § 7-64-603, which was formalized by this court's Decree of Dissolution. In practical effect the partnership ended when construction began.

While a decree of dissolution is normally followed by a winding up of the partnership business, under judicial supervision pursuant to § 7-64-803, there is nothing more to be done in this case because the only partnership asset has been sold at a judicial sale. S&J claims that it is entitled to $406,703.62 based on its calculation of $356,703.62 for 30% of the losses and equalizing capital accounts plus repayment of the $50,000 profit advance to Leoff. It argues that this final accounting should be made independently of a determination of fault on the part of either of the partners both respect to their duties as partners and on the other claims.

-14-

The difficulty with that argument is that it presupposes that the claimed losses would have occurred regardless of the conduct of the parties.  That is not this case.  The principal problem with the White House project was delay in getting the units ready for sale at a time when market conditions were favorable.

S&J claims that Leoff is responsible for the delay in getting the Certificate of Acceptability but no such objection was made in March, 2006, when the Management Agreement was signed with S&J's acknowledgment that Leoff had performed the duties described in paragraph (1).  S&J also seeks to hold Leoff responsible for the delay in completion of the construction but the evidence received at trial does not support such a finding.  To the contrary, Lehrer, for S&J, supervised Mitchell's performance, approved change orders and tolerated the lack of timely performance by High Mark.

Leoff's claims against S&J are based on the assumption that but for S&J's violation of its duties to the partnership the units would have been completed and sold for a profit in 2007 while the market was robust.  That assumption is too speculative to determine a measure of damages even if S&J was at fault for the delay.

The lis pendens filing was unwarranted and gives rise to a statutory liability under C.R.S. § 38-35-109(3).

S&J asserts that Leoff's filing of the improper mechanics' lien thwarted a proposed XYZ transaction that would have generated $4,300,000 in May 2008.  Alternatively, S&J contends that Leoff's filing of the improper lis pendens thwarted a proposed XYZ transaction would have generated $3,964,720 in July 2009.  S&J seeks damages in the amount of 70% of the difference

between one of those amounts and the $3,150,000 bid at the court-ordered sale on January 28, 2011. (i.e., either $805,000 or $570,304).

The evidence presented at trial was not sufficient to support an award of damages in either of those amounts.  The letter from S&J's counsel to Alpine Bank dated May 16, 2008 (Ex. 19) shows only that the XYZ transaction was the subject of negotiations between S&J and XYZ in May 2008.  S&J did not present evidence showing that XYZ was actually prepared to consummate the proposed transaction at that time.  Similarly, S&J's claim for damages in the amount of $570,304 is based on the "XYZ concept" described in the memorandum from S&J's counsel to Leoff's attorney dated July 30, 2009.  (Ex. B-10.)  That document describes negotiations with XYZ, but there is no evidence of an actual agreement with XYZ in July 2009. S&J did not plead a claim of intentional interference with contract.

S&J's damage calculations miss the mark for the additional reason that the proposed XYZ transaction was not a sale of the nine White House units.  The proposal was for XYZ to pay S&J the difference between value of the eight free market units and their value as deed-restricted units (approximately $2 million).  The remaining portion of the "sales price" was not cash.  It was the estimated profit that S&J would receive through future sales of nine deed-restricted White House units.  In short, even if the proposed XYZ transaction had been consummated in May 2008 or July 2009, S&J would not have received $4.3 million on May 2008 or $3.9 million in July 2009.

Although S&J did not present sufficient evidence to support its claimed damages from the loss of the proposed XYZ transaction, there is a statutory penalty of $1,000 and there may be recovery of reasonable attorneys' fees associated with S&J's efforts to seek release of the

mechanics' lien and lis pendens.  The difficulty is that release of the lis pendens was but a minor part of this litigation and not separable from the other issues.

S&J's claim for payment of $50,000 as a return of the advance paid to Leoff to be applied to his 30% share of profits has superficial appeal because the White House project did not produce a profit.  The difficulty is that the Management Agreement refers to sharing in the profits and losses of S&J, not of the White House project and the definition of loss is that in III-R of the Operating Agreement defining taxable income or loss for each fiscal year.  The tax returns for S&J are not in evidence.  The claim has not been proven.

This is an exceptional case leading to the unusual ultimate conclusion that neither the plaintiff nor the defendant has met the burden of proof for their claims against each other beyond that which was provided by the Decree of Dissolution and Order of Sale with the exception of the statutory penalty of $1,000 for the improper filing of lis pendens.

Accordingly, it is

ORDERED, that the defendant S and J Land Company shall have and recover $1,000 from the plaintiff Richard "Chance" Leoff and that all other claims and counterclaims are dismissed with prejudice without any award of costs.

Dated:  June 3, 2011

BY THE COURT:


s/Richard P. Matsch
_____
Richard P. Matsch, Senior District Judge